UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

CAROL LEMON MCKNIGHT,

                      Plainti

     -against-

COMMISSIONER OF SOCIAL SE

                 Defendant.
-------------------------------------------------------------X

*No objections to this Report and Recommendation have been received.  Accordingly, I have reviewed it for clear error. Finding none, I hereby adopt it as the decision of the Court. Defendant's motion for judgment on the pleadings is granted and the case is dismissed.  The Clerk of Court is respectfully directed to send a copy of this endorsement to Plaintiff, enter judgment for Defendant, and close the case.*

SO ORDERED.

*Cathy Seibel*

CATHY SEIBEL, U.S.D.J.

**REPORT AND RECOMMENDATION**

17 Civ. 1054 (CS)(JCM)

*8/24/18*

To the Honorable Cathy Seibel, United States District Judge:

      Plaintiff Carol Lemon McKnight ("Plaintiff"), appearing *pro se,* commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security ("the Commissioner"), which denied Plaintiff's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, finding her not disabled.  Presently before this Court is the Commissioner's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket No. 16).  Plaintiff has not opposed the motion.  For the reasons below, I respectfully recommend that the Commissioner's motion be granted.

**I.  BACKGROUND**

      Plaintiff was born in 1957. (R.[1] 41).  She filed applications for DIB and SSI benefits in November 2013, alleging disability as of September 1, 2011, due to an injury to her left hand, asthma, hypertension and angina pectoris. (R. 41, 47, 105–17).  After her applications were initially denied on January 14, 2014, (R. 55, 67), Plaintiff requested a hearing, (R. 79).  On April

---

[1] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social security benefits, filed in this action on June 14, 2017. (Docket No. 15).

17, 2015, she appeared before Administrative Law Judge ("ALJ") Marissa Ann Pizzuto. (R. 22–40).  On July 24, 2015, the ALJ issued a written decision finding that Plaintiff was not disabled. (R. 6–18).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Plaintiff's request for review on December 9, 2016. (R. 1–3).

On February 2, 2017, Plaintiff commenced this action by filing a complaint (the "Complaint"), which alleges that she became entitled to receive disability benefits because of "back injury, asthma, hand injury [and] neck injury." (Docket No. 2 at 1).  The period at issue is from Plaintiff's alleged September 1, 2011 onset date through the Commissioner's July 24, 2015 final decision.

**A.  Plaintiff's Medical Treatment History**

As summarized below, the administrative record reflects medical treatment Plaintiff received from various sources for, among other things, asthma, back pain, hypertension and thumb pain.

 On September 12, 2011, Plaintiff was seen by Dr. Abraham Chacko at Harlem Hospital Center ("HHC") for complaints of asthma and a hurt back. (R. 551).  Lumbosacral x-rays revealed likely degenerative changes of the thoracic spine, which Dr. Chacko believed might be a compression fracture at T12, as well as degenerative disc disease at the L5-S1. (R. 220, repeated 283, 377; R. 551).  Dr. Chacko noted that Plaintiff's lungs were clear with good air movement. (R. 551).  Plaintiff was discharged with diagnoses of backache, unspecified, and extrinsic asthma with (acute) exacerbation, with prescriptions for Albuterol inhaler and prednisone. (R. 551).  Plaintiff was also referred to an orthopedic clinic. (R. 264, repeated 398).

On November 2, 2011, Plaintiff visited Renaissance Diagnostic Treatment Center ("Renaissance").  Dr. Roger Smoke observed on physical examination normal findings apart from a left-foot callus and a weakly positive straight leg raise. (R. 266, repeated 400).  Diagnoses

were backache, unspecified, and benign essential hypertension. (R. 212, 214, 266).  Plaintiff was instructed to consult an orthopedist and a podiatrist and to try tramadol. (R. 267).  Her hypertension remained benign through September 2014. (R. 242, 245, 248, 337, 414, 419, 424, 429).  Dr. Smoke noted that Plaintiff had missed appointments and that her medical records were "in disarray." (R. 266).

On November 4, 2011, Plaintiff presented to HHC's emergency room complaining of painful respiration. (R. 293).  Chest x-rays showed clear lungs and mild cardiomegaly with no evidence of significant pulmonary vascular congestion or focal consolidation. (R. 219, repeated 285, 396).  Plaintiff was evaluated, began to feel better, and was discharged with a diagnosis of psychogenic pain and painful respiration. (R. 293).  Plaintiff returned to HHC's emergency room on February 2, 2012, where she started nebulizer treatment, but then discontinued it when she was not admitted to the hospital. (R. 336).  The diagnosis was intrinsic asthma, unspecified. (R. 336–37).  Plaintiff was also provided with nebulizer treatment pursuant to emergency room visits in June 2012 and February 2013, although she was consistently found fully ambulatory with good bilateral air entry of the lungs. (R. 301, 305–09, 334–35, 341).

On August 30, 2012, Plaintiff saw Dr. Handel White regarding back and chest pain. (R. 241–43, repeated 342–44, 405–07).  She had fallen on the stairs at a school in September 2011, and took Motrin for the pain. (R. 241).  She also complained of left-sided chest pain for the preceding year, both with exertion and at rest. (R. 241).  A physical examination revealed swollen nasal turbinates in her mouth. (R. 242).  Dr. White heard a split S1 heart sound, but no respiratory murmur. (R. 242).  Her lungs had good air entry with no wheezes, rhonchi or rales. (R. 242).  Her back was not tender and her straight leg raise was adequate; her extremities were unremarkable. (R. 242).  A mildly tender parasternal node and "trigger finger" of her third digit

were noted. (R. 242).  Dr. White diagnosed other chest pain, lumbago, intrinsic asthma, unspecified, chronic rhinitis and "overweight." (R. 242).  Plaintiff was noted to be overweight at visits through September 2014. (R. 245, 248, 462).

Plaintiff again complained of chest pain on September 20, 2012, when she saw physician assistant ("PA") Jenora Randolph at HHC. (R. 223–25, repeated 330–32, 437–38).  She could only walk one-and-a-half blocks before becoming short of breath. (R. 224).  An examination produced normal results, including clear lungs. (R. 224–25).  Plaintiff was diagnosed with "other chest pain," and a stress test and echocardiogram were recommended. (R. 224).  Plaintiff returned to HHC for follow-up on October 4, again complaining of shortness of breath and chest pain, without having undergone the recommended tests. (R. 226–29, repeated 326–29).  A physical examination yielded unremarkable results, showing clear lungs, full motor strength, normal extremities, no back tenderness and normal cardiovascular function. (R. 227–29).  An exercise stress echocardiogram on October 9, 2012, produced normal results, although poor exercise tolerance and baseline cardiomyopathy were noted. (R. 229–33).  A stress test revealed that Plaintiff's resting blood pressure was within normal limits and rose normally with exertion. (R. 232, 288–89).

When Plaintiff returned to Dr. White on October 16, 2012, she rated her back pain as a three on a ten-point scale. (R. 244–46, repeated 345–47, 408–10).  Plaintiff described her asthma as "okay," denied chest pain, syncope (fainting), orthopnea and lower extremity swelling, and reported experiencing occasional heart palpitations climbing stairs. (R. 245).  An examination yielded generally normal findings except for continued split S1 heart sound and reduced straight leg raising. (R. 245).  Evaluation of her extremities was normal, and her back was not tender. (R. 245).  Dr. White diagnosed lumbago and pure hypercholesterolemia. (R. 245; *see also*

R. 248, 419, 424, 429, 461).  Noting that she needed to take her hypertension medication that day, Dr. White merely advised compliance with medication and reducing sodium. (R. 245).

On October 22 and 23, 2012, Plaintiff presented to the HHC emergency department with mouth and lower back pain. (R. 319–25).  Upon examination, Plaintiff was ambulatory and cooperative, with cracked teeth and swollen gums. (R. 319).  Her lungs were clear, her heart sounds were normal, and her pulses were strong and symmetric. (R. 319).  Her gait and motor strength and sensation were likewise normal. (R. 319).  Although paraspinal tenderness was noted, she had no point tenderness, and a straight leg raise test was negative. (R. 320).  The diagnoses were lumbago and unspecified disorder of the teeth, and she was discharged in stable condition. (R. 320–22).  Dr. Muhammad Hayat Syed of HHC examined Plaintiff on October 25, 2012, and found, despite her reported chronic back and chest pains, no objective evidence of cardiac disease; Plaintiff was deemed cardiac stable for all activities. (R. 233–34).  A transthoracic echocardiogram done on November 16, 2012 showed no evidence of significant valvular disease or pulmonary hypertension. (R. 290–92).

On February 1, 2013, Plaintiff returned to HHC's emergency department and was examined by Dr. Earl Scott, who noted that she was alert and oriented, with bilateral wheezing. (R. 310–13, repeated 348–49).  Lumbosacral x-rays showed stable degenerative disk disease, but no evidence for acute fracture or spondylolisthesis. (R. 218; *see also* R. 310 (explaining that x-ray yielded "no acute finding")).  Plaintiff was diagnosed with lumbago. (R. 196, repeated 286, 472).  Right hand x-rays to rule out a thumb injury showed preserved joint spaces, no acute fracture or dislocation, and possible soft-tissue swelling at the fifth digit. (R. 217, repeated 287, 486).  Plaintiff was discharged in stable condition. (R. 310).

When Plaintiff presented to HHC's emergency department on February 21, 2013, she complained of pain in her right thumb, stating that tramadol provided minimal relief. (R. 301). She was diagnosed with joint pain and told to continue pain medication, use a splint and apply a cold compress, and follow up with the hand clinic. (R. 302–03).

On February 22, 2013, Plaintiff went to an appointment at HHC's Neuro-Surgery department due to back pain, which she said radiated below her left knee. (R. 235, repeated 299, 492, 633). She further stated that she occasionally felt numbness in her left foot, that she could only walk one block without pain, and that she had difficulty getting up from a seated position and bed. (R. 235). PA Nicole Wright observed on examination that Plaintiff walked normally with normal balance and had no neurological deficits. (R. 236). Limitation on forward flexion and spasms due to pain was noted, but her lateral bending was normal, and her motor strength was nearly full with a four-out-of-five rating on her left lower extremity with normal reflexes. (R. 236). Plaintiff had normal motor and tone in her left lower extremity, normal flexion and extension of her hip, knee and ankle. (R. 236). She was diagnosed with lumbago and told to return in two weeks. (R. 236).

On March 13, 2013, hand surgeon Dr. Beth Preminger evaluated Plaintiff regarding complaints of bilateral thumb pain. (R. 237, repeated 297). Dr. Preminger observed that flexion in the thumbs was too painful to elicit frank triggering and diagnosed acquired trigger finger. (R. 237). Dr. Preminger administered a Kenalog injection in Plaintiff's right thumb, which Plaintiff tolerated well. (R. 237). Dr. Ferdinand Ofodile gave Plaintiff a Kenalog injection in her left thumb two weeks later. (R. 239, repeated 296).

On April 3, 2013, Plaintiff saw Dr. White for a follow-up visit. (R. 247, repeated 353–54, 411–12). Plaintiff reported she could walk four blocks at a time, but was limited by back pain.

(R. 248).  Dr. White's physical examination produced unremarkable results, including normal heart sounds, good air entry in her lungs, and the ability to sit with her knees extended. (R. 248). Dr. White diagnosed lumbago and hypertensive heart disease, unspecified and without heart failure, and continued her medication. (R. 248).

On July 24, 2013, Plaintiff saw Dr. Joseph Casale at HHC who referred her for hand therapy and administered Kenalog injections in each thumb. (R. 294).  He also manually manipulated the left thumb until function returned. (R. 294).  On December 19, 2013, Plaintiff saw PA Marie Paul regarding lower back pain and painful thumbs. (R. 413–14).  Plaintiff's gait was normal, and a physical examination was notable only for tenderness to the lower back. (R. 414).  The diagnosis was acquired trigger finger. (R. 414).  Plaintiff next saw Dr. Kevin Small on March 12, 2014 for her thumb pain. (R. 454–55).  Dr. Small provided a Kenalog injection in her first digit trigger finger and recommended strength training. (R. 454).

On May 13, 2014, Plaintiff returned to Dr. White complaining of three-out-of-ten pain in her lower back and in her left hand. (R. 417).  Dr. White's physical examination findings were normal, including normal gait, non-tender back and good air entry. (R. 418–19).  Dr. White diagnosed unspecified backache. (R. 419, 434).

On August 15, 2014, Dr. Francisco Santoni evaluated Plaintiff for her sinus complaints. (R. 421).  On examination, her lungs were clear to auscultation and percussion with no audible wheezing. (R. 424).  While mildly reduced breath sounds were noted, (R. 424), Plaintiff had not used her albuterol inhaler in two months, (R. 422).  A physical examination revealed that she was healthy-appearing, articulating and ambulating at ease, and able to carry a backpack and a bag. (R. 423).  She was alert and fully oriented, with a normal affect and no evident thought disorder. (R. 423).  She did have nasal discharge, and two of her upper frontal tooth roots were exposed.

(R. 423).  She was diagnosed with "other chronic sinusitis" and a cough, as well as an unspecified disorder of the teeth and supporting structures, chronic rhinitis, hypertensive heart disease without heart failure, cocaine abuse, episodic use, nasal bones, closed fracture and a personal history of physical abuse. (R. 424).  She was referred to an ear, nose and throat specialist and to a social worker regarding her history of cocaine use, which she reported last using more than a year prior. (R. 425).

Plaintiff complained of intermittent heart palpitations to Dr. Melissa Fajardo at HHC's cardiology department on September 4, 2014. (R. 456, repeated 695–97).  A physical examination produced unremarkable results. (R. 458).  Plaintiff admitted to not taking her blood pressure medication (hydrochlorothiazide) every day, (R. 457), and was educated on compliance, (R. 462).  Dr. Fajardo diagnosed hypertensive heart disease, unspecified, without heart failure. (R. 461).  An electrocardiogram revealed normal sinus rhythm and left ventricular hypertrophy and a nonspecific T-wave abnormality. (R. 489–90).

The following day, on September 5, Dr. Cheryl Smith, at Renaissance, evaluated Plaintiff's complaints of back, arm and right hand pain. (R. 427–31).  A physical examination was notable only for Plaintiff's obesity and that she wore a right wrist brace. (R. 429).  In a questionnaire, Plaintiff reported issues with sleep, fatigue and appetite, so she was referred to a social worker for a psychosocial assessment. (R. 429–30).

On September 10, 2014, Plaintiff saw Dr. Norman Morrison and PA Johanna Amar at HHC's hand surgery department regarding her bilateral trigger thumb. (R. 463–64).  A physical examination involved touch of a large mass "at A1 pulley," but there was no motor or sensory deficit. (R. 463).  Dr. Morrison noted that her right thumb was worse than her left and

administered a Kenalog injection to the right hand. (R. 464).  Plaintiff was considering surgical release. (R. 464).

Dr. Francisco Santoni, at Renaissance, diagnosed Plaintiff with acute bronchitis on November 19, 2014, noting suspected exacerbated seasonal extrinsic asthma. (R. 379–84).  Dr. Santoni's physical examination revealed Plaintiff to be healthy-appearing, loquacious and able to ambulate and articulate at ease. (R. 381).  Plaintiff had abnormal air entry only "scant[ly] reduced." (R. 381).  An electrocardiogram was abnormal in that it had a nonspecific T-wave abnormality but a normal sinus rhythm; it reflected no significant change from the one done September 4, 2014. (R. 404).

HHC physical medicine and rehabilitation specialist Dr. Xiaoguang Liu evaluated Plaintiff on December 1, 2014, regarding her complaint of bursitis. (R. 466).  On examination, she had a clear chest, limited range of motion in her hand and lumbar spine, four-out-of-five muscle strength, and a negative straight leg raise. (R. 467).  Dr. Liu diagnosed lumbago and recommended occupational therapy. (R. 466–68).

Chest x-rays taken on December 17, 2014, showed clear lungs. (R. 482, repeated 657). An abdominal ultrasound showed that Plaintiff had hyperechoic liver parenchyma which could represent hepatic steatosis (fatty liver disease). (R. 483, repeated 658).

Plaintiff was evaluated by occupational therapist ("OT") Yuen Li on December 19, 2014, who diagnosed trigger finger (acquired) and joint pain in Plaintiff's right thumb. (R. 468–71). OT Li noted Plaintiff was alert and able to follow multi-step commands, but was not cooperative. (R. 471).  OT Li noted slightly reduced ranges of shoulder motion bilaterally, save left shoulder external and internal rotation, which were within functional limits. (R. 469–70).  Elbow range of motion was within normal limits. (R. 469–70).  Wrist extension bilaterally and right wrist flexion

were also reduced, although left wrist flexion was within functional limits, as were the digits on both hands. (R. 469–70).  Plaintiff was able to make a full fist bilaterally, although grip strength was reduced. (R. 469–70).  Plaintiff reported to OT Li that she was independent with her activities of daily living, but that if she had too much back pain her daughter provided assistance. (R. 469).

On January 8, 2015, HHC OT Pedro Estevez administered a seventy-minute therapy treatment, which included therapeutic exercises and manual therapy for her hands, which she tolerated without distress. (R. 491, repeated 689).  OT Estevez said she could do weight-bearing as tolerated. (R. 491).  Plaintiff returned to OT Estevez on January 15 and 29, and both times tolerated similar therapy with pain. (R. 487–88).  OT Estevez repeated that she could do weight bearing as tolerated. (R. 487–88).

On February 10, 2015, Plaintiff saw physical therapist ("PT") Maria Kristie Guillera for her back pain. (R. 684).  Plaintiff reported being independent in all activities of daily living and living in a fourth-floor walk-up apartment. (R. 684).  While Plaintiff's lumbar lateral flexion was reduced, active and passive range of motion in both lower extremities was within functional limits; strength was somewhat decreased. (R. 685).  She was independent in her ability to roll in bed and transfer herself from a bed or a chair. (R. 685).  PT Guillera advised four to eight weeks of aerobic exercises and endurance training. (R. 686).

On February 19, 2015, Plaintiff saw OT Melvon Grant for hand therapy, reporting that although her back hurt, her hand was much better. (R. 683).  Plaintiff tolerated a forty-five-minute therapeutic session well. (R. 683).  On February 24, Plaintiff was ambulating independently and exercising for the duration of a sixty-five-minute physical therapy session for back pain, after which she reported decreased pain. (R. 682).

10

On March 19, 2015, Plaintiff saw PA Janvier Ivrose regarding complaints of heart palpitations for the preceding six months. (R. 585–91, repeated 678–81). Plaintiff claimed she experienced a racing feeling in her heart on a daily basis, but mostly at night while laying down and had no associated dizziness, shortness of breath or chest pain. (R. 585). Past tests were reviewed and it was determined that Plaintiff should try wearing a twenty-four-hour Holter monitor to rule out underlying arrhythmias. (R. 586–90, 614). Her hypertension was noted to be controlled and she was told to follow up in one month. (R. 590).

Magnetic resonance imaging ("MRI") of Plaintiff's lumbosacral spine was done on March 23, 2015 due to an indication of sciatica. (R. 374–76, repeated 572–74, 610–12, 655–56). The impression was that there was a slight retrolisthesis at the L5-S1 level, with no evidence of fracture or malalignment in the remainder of the lumbosacral spine. (R. 376). There was also mild-to-moderately-prominent epidural fat within the lumbosacral spinal canal, particularly at the L5 and S1 vertebral body levels, suggestive of epidural lipomatosis. (R. 376). There was moderate degenerative disk disease at the L5-S1 level, with moderate posterior disk bulge and mild-to-moderately-prominent epidural fat associated with mild-to-moderate spinal canal stenosis. Mild degenerative disease was at the L4-L5 level, without evidence of significant spinal canal stenosis, although mild spinal canal stenosis was noted at the inferior L5 vertebral body level, largely related to the epidural lipomatosis. (R. 376). There was a small, left anteromedial disk herniation and annular tear at the L5-S1 level, with no evidence of posterior disk herniation throughout the lumbosacral spine. (R. 376). A test of Plaintiff's bone density was normal, indicating she had no increased risk of fracture. (R. 654).

During physical therapy for her back the next day, March 24, PT Guillera observed that Plaintiff could walk independently and that she was able to do a series of exercises, following which she reported decreased pain. (R. 677).  She could do weight bearing as tolerated. (R. 677).

On March 25, 2015, Dr. Santoni observed Plaintiff to be doing well, with a normal gait and a regular heart rate and rhythm. (R. 652–53).  On April 1, 2015, Plaintiff went to physical therapy for bursitis and was noted to be functionally independent. (R. 675).

On April 7, 2015, Plaintiff complained to PT Guillera about pain at a level eight out of a ten-level scale, but tolerated thirty-five minutes of treatment without distress. (R. 674).  In a medical source statement dated April 7, 2015, PT Guillera opined that Plaintiff could not walk a block at a reasonable pace on rough or uneven surfaces, but could shop, travel alone, ambulate without a wheelchair, or two canes or two crutches, use public transportation, and climb a few steps at a reasonable pace with the use of a single hand rail. (R. 565).  PT Guillera stated that lifting activities or prolonged positioning aggravated Plaintiff's symptoms. (R. 565).

Plaintiff saw OT Estevez for occupational therapy on April 9, 2015, and tolerated forty minutes of treatment without distress. (R. 673).  That same day, OT Estevez completed a function report, (R. 559–64), stating that Plaintiff could frequently lift and carry up to ten pounds and occasionally lift and carry up to twenty pounds, but never more. (R. 559).  He stated Plaintiff could frequently operate foot controls with both feet and occasionally climb stairs and ramps, balance, stoop and kneel, but should never climb ladders or scaffolds, crouch or crawl. (R. 562–63).  He noted that she had increased pain on stairs, decreased balance, and a limitation of motion and that it was variable whether she could sort, handle or use paper files, and noted that repetitive movement of the thumb or thumping on objects increased joint swelling and pain in trigger fingers. (R. 563–64).

Dr. Santoni completed a general medical report on April 10, 2015, noting the presence of cardiomyopathy, but stating that he was not qualified to answer questions about Plaintiff's ability to sit, stand and walk. (R. 555–58).

## B.  Consultative Evaluation

Consultative examiner Dr. Ted Woods examined Plaintiff on January 7, 2014. (R. 359–62).  Plaintiff reported that she had low back pain since suffering a fall in 2011 and that the pain was intermittent, allowing her to walk about a block and walk up a flight of stairs and then rest. (R. 359).  She had never received injections in her back, although she had received injections in her trigger fingers in both thumbs, which she said were helpful. (R. 359).  She had hypertension, for which she took medication daily, and she reported dizziness at times, especially when she thought her pressure was too low. (R. 359).  She denied chest pain and reported having asthma for about five years and using a pump or inhaler as needed. (R. 359).  Plaintiff reported taking Tramadol, Ipuprofen, Hydrochlorothiazide, Enalapril, Simvastatin and Loratadine, and using an Albuterol inhaler as needed. (R. 360).  Plaintiff told Dr. Woods that she was able to cook three times a week and clean, do laundry and shop once a week. (R. 360).  She was able to shower, bathe and dress herself. (R. 360).  She enjoyed reading, watching television, listening to the radio and going to the library. (R. 360).

Dr. Woods's physical examination revealed elevated blood pressure, for which he advised Plaintiff to follow up with her primary care doctor. (R. 360, 363).  Plaintiff had a normal stance and gait and could walk on heels and toes without difficulty.  She was able to do a full squat while holding on to the examination table and could rise from a chair without difficulty. (R. 360). The rest of the examination was similarly unremarkable; Plaintiff's lungs were clear to auscultation and her heart had a regular rhythm. (R. 361).  Her cervical and lumbar spine showed full flexion, extension, lateral flexion bilaterally, and rotary movement bilaterally. (R. 361).  She

had no abnormalities in her thoracic spine and a straight leg raise was negative bilaterally.
(R. 361).  She had full range of movement of her shoulders, elbows, forearms and wrists
bilaterally as well as full range of movement of her hips, knees and ankles. (R. 361).  Her joints
were stable and nontender with no redness, heat, swelling or effusion. (R. 361).  Her deep tendon
reflexes were physiologic and equal in her upper and lower extremities, and no sensory deficits
were noted.  She had full strength in her upper and lower extremities. (R. 361).  Her extremities
were normal and her hand and finger dexterity was intact.  She additionally had full grip strength
in her hands. (R. 361).  Dr. Woods diagnosed low back pain, bilateral trigger finger, hypertension
and asthma, all by history. (R. 362).  He rated her prognosis as good and opined that she had no
limitations in her ability to sit, stand, push, pull, climb or carry heavy objects, although she
should avoid dust, smoke and other known respiratory irritants. (R. 362).

**C.  Plaintiff's Testimony**

Plaintiff testified at the April 17, 2015 hearing before ALJ Pizzuto. (R. 22–40).  At the
hearing, the ALJ advised Plaintiff of her right to be represented, but Plaintiff elected to proceed
without representation. (R. 24–27).  Plaintiff testified that she had worked as a typist since age
eighteen and that she had also attended nursing school. (R. 27, 31, 34).  She complained of back
pain, which worsened after a fall in September of 2011 or 2012. (R. 28–29).  She testified that
she uses a cane, which was provided by the hospital, and that she can "hardly walk." (R. 31, 34).
She also complained of trigger finger and stated that she has difficulty grasping things with her
hands. (R. 34–35).  She said that she could pick up things from the floor, provided she does so
slowly. (R. 38).  She testified that she is "[a] little bit" uncomfortable when she writes and
sometimes uncomfortable when she sits. (R. 35–36).  She estimated that she could stand for
about ten to fifteen minutes when leaning on something and that she could walk about half of a
block. (R. 36).  She testified that she usually travels to appointments by taking the bus and that

14

she took a train to attend the hearing. (R. 36–37).  She said that she was not able to wash dishes and that her daughter did laundry for her. (R. 38).

**D.  ALJ's Pizzuto's Decision**

ALJ Pizzuto applied the five-step approach in her decision dated July 24, 2015. (R. 9–18).  At step one, ALJ Pizzuto found that Plaintiff had not engaged in substantial gainful activity since September 1, 2011, the alleged onset date. (R. 11).  At step two, the ALJ found that Plaintiff had the following severe impairments: severe back disorder, asthma and status post injury to her left hand. (R. 11–12).  The ALJ also considered Plaintiff's hypertensive heart disease, but found that it was not severe. (R. 12).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 12).  The ALJ specifically considered whether Plaintiff's back problems met or equaled Listing 1.04, whether her asthma met or equaled Listing 3.03, and whether her hand injury met or equaled Listing 1.02. (R. 12–13).

Before step four of the sequential evaluation, the ALJ assessed Plaintiff's residual functional capacity ("RFC") and found that Plaintiff retained the ability to perform the full range of sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), with a need to avoid concentrated exposure to respiratory irritants such as temperature extremes, fumes and gases. (R. 13–17).

At step four, the ALJ found that Plaintiff's past work as a clerk/typist met the recency, duration and earnings requirements of past work. (R. 17).  The ALJ then found that Plaintiff was able to perform her past relevant work because it is a sedentary job without exposure to respiratory irritants or temperature extremes and therefore consistent with the RFC. (R. 17).  Having found that Plaintiff could perform past relevant work, the ALJ determined, without

reaching step five, that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 1, 2011 through the date of the decision. (R. 17).

## II.  DISCUSSION

In the Complaint, Plaintiff asserts summarily that the ALJ's decision "was erroneous, not supported by substantial evidence in the record, and/or contrary to law." (Docket No. 2 at 2). Conversely, the Commissioner's motion papers argue that the ALJ's decision should be affirmed because it is supported by substantial evidence in the record and free of legal error. (Docket No. 17 at 3).

### A.  Legal Standards for Disability Eligibility

A claimant is disabled if he or she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).  The Social Security Administration ("SSA") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128).  At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

**B.  Standard of Review**

When reviewing an appeal from a denial of disability benefits, the court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g).  The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard." *Brault*, 683 F.3d at 448.  The court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).  "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre*, 758 F.3d at 149.  However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

Additionally, courts must afford *pro se* plaintiffs "special solicitude." *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994).  Where, as here, a plaintiff proceeds *pro se*, the court should read her supporting papers "liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) (citing *Mikinberg v. Baltic S.S. Co.*,

17

988 F.2d 327, 330 (2d Cir. 1993)). "Even where a motion for judgment on the pleadings is unopposed, the Court must still review the entire record and ensure that the moving party is entitled to judgment as a matter of law." *Mancebo v. Comm'r of Soc. Sec.*, No. 16-CV-6400 (JPO), 2017 WL 4339665, at *2 (S.D.N.Y. Sept. 29, 2017) (quoting *Graham v. Comm'r of Soc. Sec.*, No. 16-CV-142 (LDH), 2017 WL 1232493, at *1 (E.D.N.Y. Mar. 31, 2017)).[2]

## C.  Substantial Evidence

Because the Complaint contains little detail and Plaintiff filed no opposition to the Commissioner's motion, the Court is left to surmise the specific nature of Plaintiff's objections to the ALJ's decision.  The ALJ ruled adversely to Plaintiff with respect to the following determinations: (1) that Plaintiff's hypertension was not severe; (2) that Plaintiff's impairments did not meet or equal a listed impairment; (3) that Plaintiff retained the functional capacity to perform the full range of sedentary work subject only to a restriction on exposure to respiratory irritants; and (4) that Plaintiff was able to perform past relevant work.  These determinations by the ALJ are discussed, in turn, below.

## 1.  The ALJ's Determination that Plaintiff's Hypertension Was Not Severe

To be considered "severe" within the meaning of the regulations, an impairment or combination of impairments must significantly limit a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c).  As noted by the ALJ, the record lacks any "linkage in the documentary evidence between the claimant's hypertension and any work-related limitation." (R. 12).  The medical records routinely characterize Plaintiff's hypertension as "benign," (*see, e.g.*, R. 212, 214, 242, 245, 248, 266, 337, 414, 419, 424, 429); a

---

[2] In accordance with *Lebron v. Sanders*, 557 F.3d 76, 79 (2d Cir. 2009) and Local Civil Rule 7.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, a copy of this case and any others cited herein, only available by electronic database, accompany this Report and Recommendation and shall be simultaneously delivered to the *pro se* Plaintiff.

stress test found that her resting blood pressure was within normal limits and rose normally with exertion, (R. 232, 288–89); and an echocardiogram found no evidence of pulmonary hypertension, (R. 290–92).[3]   Accordingly, substantial evidence supports the ALJ's determination that Plaintiff's hypertension did not constitute a severe impairment.

**2.   The ALJ's Determination That Plaintiff's Impairments Did Not Meet or Equal a Listed Impairment**

Under a theory of presumptive disability, a claimant may be eligible for benefits if she has an impairment that meets or equals an impairment found in the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The listings specify the criteria for impairments that are considered presumptively disabling. *See* 20 C.F.R. §§ 404.1525(a), 416.925(a).  A claimant may also demonstrate presumptive disability by showing that her impairment is accompanied by symptoms that are equal in severity to those described in a specific listing. *See* 20 C.F.R. §§ 404.1526(a), 416.926(a).

Substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments.  The ALJ specifically considered whether Plaintiff's back problems met or equaled Listing 1.04, which concerns disorders of the spine, and found that they did not. (R. 12).  Listing 1.04 requires compromise of a nerve or the spinal cord with the following:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or

---

[3] Notably, the Complaint does not identify hypertension as one of the disabilities that caused Plaintiff to become entitled to receive DIB or SSI benefits. (*See* Docket No. 2 at 1).

> B. Spinal arachnoiditis . . .
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication . . . and
> resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 1.00, 1.04.  The ALJ explained that radiology imaging of

the back showed normal alignment and stable degenerative disc disease in February of 2013,

which was unchanged from a study done in 2011. (R. 12; *see also* R. 220, 472).  No evidence of

spondylolisthesis was found in either of these studies. (R. 12; *see also* R. 220, 472).  An MRI in

March 2015 also found mild-to-moderate degenerative disc disease. (R. 376).  Although that

MRI revealed mild-to-moderate spinal canal stenosis, no associated inability to ambulate

effectively was documented. (R. 376).  To the contrary, records repeatedly indicate Plaintiff's

ability to ambulate with normal gait. (R. 236, 319, 360, 414, 418–19, 653, 677, 682, 684).

The ALJ considered Listing 3.03 for Plaintiff's asthma but found that her impairment did

not meet the listing. (R. 12).  The version of Listing 3.03 that was in effect at the time of the

ALJ's decision required asthma with either A) chronic asthmatic bronchitis or B) attacks, in spite

of prescribed treatment and requiring physician intervention, occurring at least once every two

months or at least six times a year. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.03 (version effective

July 20, 2015 to Aug. 11, 2015).[4]  Plaintiff went to the emergency department several times for

asthma complaints, (R. 301–13, 334, 336, 379–84), and was occasionally provided with

nebulizer treatments, (R. 303, 336, 341), but she was diagnosed with bronchitis only twice,

---

[4] The SSA revised the criteria used to evaluate claims involving respiratory disorders in a final rule that became
effective on October 7, 2016. *See* Revised Medical Criteria for Evaluating Respiratory System Disorders, 81 Fed.
Reg. 37138-01, 2016 WL 3185335, at *37138 (June 9, 2016).  However, that rule notes: "We expect that Federal
courts will review our final decisions using the rules that were in effect at the time we issued the decisions." *Id.* at
*37139 n.3.

(R. 178, 303–05, 379–84), and examinations generally showed clear lungs with good air

movement, (R. 13, 15; *see also* R. 219, 224–25, 228–29, 303, 319, 361,396, 424, 482, 551).

 The ALJ also determined that Plaintiff's hand injury did not meet Listing 1.02, which

concerns major dysfunction of a joint. (R. 13).  Listing 1.02 requires "gross anatomical deformity

. . . and chronic joint pain and stiffness with signs of limitation of motion or other abnormal

motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint

space narrowing, bony destruction, or ankylosis of the affected joint(s)," with the following:

> A. Involvement of one major peripheral weight-bearing joint (i.e.,
> hip, knee, or ankle), resulting in inability to ambulate effectively, as
> defined in 1.00B2b;
>
> or
>
> B. Involvement of one major peripheral joint in each upper
> extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability
> to perform fine and gross movements effectively, as defined in
> 1.00B2c.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.  The paragraph A requirements were not met because

the record demonstrates neither involvement of a major peripheral weight-bearing joint nor

inability to ambulate effectively.  With respect to paragraph B, "[i]nability to perform fine and

gross movements effectively means an extreme loss of function of both upper extremities; i.e., an

impairment(s) that interferes very seriously with the individual's ability to independently initiate,

sustain, or complete activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.00(B)(2)(c).  The record

contains substantial evidence that Plaintiff's ability to perform fine and gross movements was

intact. (*See, e.g.*, R. 361 (reflecting intact hand and finger dexterity), 469–70 (reflecting intact

fine and gross movement)).  Furthermore, x-rays of Plaintiff's hand done on February 2, 2013

showed preserved joint spaces and found no fracture or dislocation. (R. 217).  As such,

substantial evidence supports the ALJ's determination that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments.

**3. The ALJ's Determination of Plaintiff's Residual Functional Capacity**

Substantial evidence also supports the ALJ's RFC determination. The RFC is the most an individual can do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184, at *4. The RFC is assessed based on all the relevant medical and other evidence of record and takes into consideration the limiting effects of all the claimant's impairments. SSR 96-8p, 1996 WL 374184, at *2, 5. The ALJ is responsible for deciding the claimant's RFC and, in making that determination, the ALJ must consider all relevant medical and other evidence, including any statements about what the claimant can still do provided by any medical sources. *See* 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a)(3), 404.1546(c), 416.927(d)(2), 416.945(a)(3), 416.946(c). While an ALJ will consider medical opinions on a plaintiff's functioning, ultimately the ALJ is tasked with reaching an RFC assessment based on the record as a whole. 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity . . . the final responsibility for deciding these issues is reserved to the Commissioner."). Here, the ALJ performed her duty of evaluating and reviewing the record, including opinion evidence, to find that Plaintiff retained the RFC to perform sedentary work. (R. 13–17). The medical opinions are consistent with the functional demands of the RFC determined by the ALJ. (R. 359–62, 555–65).

The ALJ evaluated the medical opinion provided by consultative examiner Dr. Woods. (R. 16; *see also* R. 359–62). The ALJ gave "great weight" to Dr. Woods's opinion that Plaintiff needed to avoid respiratory irritants. (R. 16, 362). The ALJ thus included a directive to avoid concentrated exposure to respiratory irritants such as temperature extremes, fumes and gases in the RFC. (R. 13). This limitation was due to Plaintiff's asthma, which the ALJ considered but

found not to warrant further limitations, as Plaintiff's examinations generally showed clear lungs with good air movement. (R. 13, 15; *see also* R. 219, 224–25, 228–29, 303, 319, 361, 396, 424, 482, 551).  Plaintiff was, on occasion, provided with a nebulizer at the hospital and told to use Advair or albuterol as needed, suggesting that her asthma was managed with medication. (R. 15; *see also* R. 303, 336, 341, 360, 422).  Thus, the ALJ reasonably determined that the objective evidence was not consistent with the limitations alleged by Plaintiff with respect to her asthma. (R. 15).

The ALJ was more restrictive than Dr. Woods in that she found Plaintiff had hand and back problems and therefore gave little weight to Dr. Woods's opinion that Plaintiff had no limitation on carrying heavy objects. (R. 16, 362).  Specifically with respect to Plaintiff's back pain, the ALJ recognized that lumbosacral x-rays showed degenerative changes and degenerative disc disease at the thoracic and lumbosacral levels. (R. 14; *see also* 220).  Many of Plaintiff's examinations for back pain yielded unremarkable results; she was observed to have a normal and steady gait as well as normal motor strength and sensation. (R. 242, 244–45, 319–25).  The ALJ additionally observed that February 2013 x-rays showed stable degenerative disc disease. (R. 14; *see also* R. 196).  The ALJ compared the studies, noting that Plaintiff's spine was unchanged from the 2011 imaging, there was normal alignment, and no evidence of spondylolisthesis was found. (R. 14; *see also* R. 196).  Later in the month, Plaintiff complained of numbness in her lower extremities, being unable to walk one block, and having difficulty getting up from a seated position, although on examination Plaintiff had normal lateral bending, a normal gait and no neurological deficits, as the ALJ noted. (R. 14; *see also* 235–36).  The ALJ also noted that Plaintiff assigned a seven-out-of-ten rating to her back pain at a December 2013 visit, (R. 14; *see*

*also* 414–15), but the pain appeared to have improved by May 13, 2014, when Plaintiff assigned only a three-out-of-ten rating, (R. 14–15; *see also* R. 417).

The ALJ further observed that an examination by Dr. Santoni on November 19, 2014 noted no overt or tacit distress, and that Plaintiff was loquacious and ambulating. (R. 15; *see also* R. 381).  Additionally, during physical therapy sessions in February and March of 2015, Plaintiff was able to ambulate without assistive devices and left the sessions in decreased pain, (R. 15, 682, 684, 677), and in April she tolerated physical therapy without distress and was told to do weight bearing as tolerated. (R. 674).  The ALJ observed that the only significant finding from the lumbar spine MRI conducted in March 2015 was moderate degenerative disc disease at LS-S1, unchanged from previous studies. (R. 15; *see also* R. 375–76).  The ALJ also considered the opinion of PT Guillera, giving great weight to the portion stating that Plaintiff could travel without a companion for assistance, could ambulate without an assistive device and could climb stairs. (R. 16; *see also* R. 565).  These abilities are consistent with the RFC for sedentary work, which requires only occasional walking or standing. 20 C.F.R. §§ 404.1567(a), 416.967(a).

The ALJ additionally reviewed all of the medical evidence of record regarding Plaintiff's trigger thumbs, as well as the opinion of OT Estevez, to find that Plaintiff was not as limited as she alleged. (R. 16).  The ALJ noted that the February 2013 x-rays showed no acute fracture or dislocation when Plaintiff was first treated for a thumb injury. (R. 15; *see also* R. 217).  Although Plaintiff continued to complain of thumb problems and was diagnosed with joint pain and administered Kenalog injections and physical therapy, (R. 15; *see also* R. 237, 239, 294, 303, 454, 463), the ALJ noted that Dr. Woods found hand and finger dexterity intact in January 2014, and OT Li found fine and gross movement intact in December 2014, (R. 16; *see also* R. 361, 469–70).  At a further occupational therapy session to improve grip strength in January 2015, OT

Estevez noted that stretching improved Plaintiff's range of motion and flexibility in her hands. (R. 16; *see also* R. 487).  Plaintiff tolerated hand therapy well and said her hand felt better. (R. 673, 683).  The ALJ also gave significant weight to OT Estevez's opinion that Plaintiff could frequently lift or carry ten pounds, occasionally lift or carry eleven to twenty pounds, frequently operate foot controls, occasionally climb ramps or stairs, occasionally balance, stoop and kneel, and never climb ladders, ropes or scaffolds, crouch or crawl. (R. 16; *see also* 559–63).  These limitations are consistent with the RFC for sedentary work, which requires lifting no more than ten pounds at a time. 20 C.F.R. §§ 404.1567(a), 416.967(a).  Additionally, by its very nature, sedentary work is mostly seated and is compatible with a restriction to only occasional stooping; it does not generally involve actions such as crouching or crawling, let alone climbing ladders, ropes or scaffolds. *See* SSR 96-9p, 1996 WL 374185, at *7–8.

OT Estevez further noted that repetitive movement of the thumb or thumping on objects increased joint swelling and pain in the trigger fingers. (R. 564).  This statement is not necessarily inconsistent with the RFC determination because disability requires "more than mere inability to work without pain." *Dumas v. Schweiker*, 712 F.2d 1545, 1522 (2d Cir. 1983); *see also Ortiz v. Astrue*, 875 F. Supp. 2d 251, 260 (S.D.N.Y. 2012) (finding plaintiff's joint pain insufficient to establish disability); *Magee v. Astrue*, No. 06 CIV. 0505 (SCR), 2009 WL 464930, at *4 (S.D.N.Y. Feb. 25, 2009) (affirming ALJ's decision where "medical records [did] not indicate pain so severe as to prevent [plaintiff] from performing the full range of sedentary work").  "To be disabling, pain must be so severe, by itself or in conjunction with other impairments, as to preclude any substantial gainful employment. Otherwise, eligibility for disability benefits would take on new meaning." *See Dumas*, 712 F.2d at 1522.

Since therapy improved the condition in Plaintiff's hand and her fine and gross manipulative skills were not shown to be impaired, the ALJ reasonably concluded that Plaintiff was not as functionally limited as she alleged. (R. 16). Weighed differently, the evidence in the record might support an RFC that included an additional restriction on repetitious movement of the thumb; however, "[i]t is for the SSA, and not this court, to weigh the conflicting evidence in the record." *Schaal*, 134 F.3d at 504; *see also Cage*, 692 F.3d at 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence.").

Moreover, the ALJ properly evaluated Plaintiff's credibility. (R. 14–17). When determining a claimant's RFC, an ALJ must take the claimant's subjective reports of pain and other limitations into account, but she is not required to accept these complaints without question. *See* 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, 1996 WL 374186; *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Rather, the ALJ "may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier*, 606 F.3d at 49. The credibility analysis is a consideration of how a claimant's symptoms actually affect her functioning. *See* 20 C.F.R. §§ 404.1529(d)(4), 416.929(d)(4) ("[W]e will consider the impact of your impairment(s) and any related symptoms, including pain, on your residual functional capacity."), 404.1545(a), 416.945(a) ("Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting."). Accordingly, "[i]n making a finding about the credibility of an individual's statements, the adjudicator need not totally accept or totally reject the individual's statements." SSR 96-7p, 1996 WL 374186, at *4.

The ALJ examined the medical evidence, as well as Plaintiff's testimony, and determined that, although Plaintiff's medically determinable impairments could reasonably be expected to

cause her alleged symptoms, her statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely credible. (R. 13–17). *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 WL 374186.  The ALJ also evaluated Plaintiff's activities of daily living and found that they were not consistent with her allegations of totally disabling physical symptoms and limitations.  Although Plaintiff testified to having difficulty walking and cooking at the hearing, at other points she stated that she was able to cook meals, walk up the four flights of stairs to her apartment, and generally be independent with her activities of daily living. (R. 14; *see also* R. 38, 360, 469, 684).  The Court has "no reason to second-guess the credibility finding in this case where the ALJ identified specific record-based reasons for [her] ruling." *Stanton v. Astrue*, 370 F. App'x 231, 234 (2d Cir. 2010).

### 4.  The ALJ's Determination that Plaintiff Could Perform Past Relevant Work

The ALJ additionally found, at step four, that Plaintiff's past work as a clerk/typist, which Plaintiff did from 2004 to 2007, met the frequency, duration and earnings requirements of past relevant work. (R. 17; *see also* R. 119–35, 160, 175). 20 C.F.R. §§ 404.1560(b)(1), 404.1565, 416.960(b)(1), 416.965.  The ALJ then determined that Plaintiff was able to perform her past relevant work because it is a sedentary job without exposure to respiratory irritants or temperature extremes and thus consistent with the RFC. (R. 17). *See* U.S. Dep't of Labor, Dictionary of Occupational Titles (DOT) (4th ed. 1991), Code 203.362-010.  Vocational expert testimony is not required where, as here, the ALJ finds a claimant can perform her past relevant work. *See Stanton*, 370 F. App'x at 235.

Because Plaintiff did not meet her step-four burden of proving that she could not perform her past relevant work, it was not necessary for the ALJ to proceed to step five and consider Plaintiff's ability to perform other work in the national economy. *See* 20 C.F.R. §§ 404.1520(f)–

(g), 416.1520(f)–(g).  Accordingly, the ALJ's decision was supported by substantial evidence in the record and based on correct legal standards.

## III.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the Commissioner's motion be granted and the case be dismissed.  The Clerk of Court is respectfully requested to mail a copy of this Report and Recommendation to the *pro se* Plaintiff.

## IV.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report and Recommendation to serve and file written objections. *See* Fed. R. Civ. P. 6(a) and (d) (rules for computing time).  If copies of this Report and Recommendation are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of the same to file and serve written objections. *See* Fed. R. Civ. P. 6(d).  Objections and responses to objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel at the United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at said Courthouse.

Requests for extensions of time to file objections must be made to the Honorable Cathy Seibel and not to the undersigned.  Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be rendered. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(b), 6(d), 72(b); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008).


Dated:    August 3, 2018
          White Plains, New York

**RESPECTFULLY SUBMITTED,**

JUDITH C. McCARTHY
United States Magistrate Judge